UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ORLANDO HEALTH, INC.,

    Plaintiff,

v.                                                       Case No. 6:24-cv-693-JA-LHP

HKS ARCHITECTS, INC.,

    Defendant.
_____

HKS ARCHITECTS, INC.,

    Third-Party Plaintiff,

v.

BBM STRUCTURAL
ENGINEERS, INC.,

    Third-Party Defendant.
_____

## ORDER

This breach-of-contract action[1] arises from the design and construction of

---

[1] This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship. Plaintiff, Orlando Health, Inc. is a citizen of Florida, and Defendant/Third-Party Plaintiff, HKS Architects, Inc., is a citizen of Texas.
    HKS's claims against the Third-Party Defendant, BBM Structural Engineers, Inc., fall within this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). *See* 28 U.S.C. § 1367(a) (providing that, with certain exceptions, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy" and "[s]uch supplemental jurisdiction shall include claims that involve

a six-story hospital and supporting departments in Lake Mary, Florida. Orlando Health, Inc. contracted HKS Architects, Inc. (HKS) to serve as architect of record and to be responsible for the planning, architectural, and engineering services—including structural engineering services—for the design and construction of the hospital. HKS then subcontracted BBM Structural Engineers, Inc. (BBM) to provide the structural engineering services for the project.

During construction of the hospital, various structural defects became obvious. These defects—which were determined to be design defects rather than construction defects—were serious, requiring immediate repairs. Orlando Health eventually filed this lawsuit to recover from HKS the costs of those repairs. And HKS has filed a third-party complaint against BBM, alleging that BBM is the responsible party because it committed the structural design errors.

HKS and BBM (collectively "Movants") now jointly move for summary

---

the joinder or intervention of additional parties").
Orlando Health has not asserted any claims against BBM; if it had, the Court would lack jurisdiction over those claims because BBM is, like Orlando Health, a citizen of Florida. *See* 28 U.S.C. § 1367(b) (providing that "[i]n any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14 . . . of the Federal Rules of Civil Procedure . . . when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332"); *see also* Fed. R. Civ. P. 14(a)(1) (allowing a defendant to file a complaint as third-party plaintiff against a nonparty "who is or may be liable to it for all or part of the claim against it," as was done in this case by HKS against BBM).

2

judgment,[2] arguing that all of the damages Orlando Health seeks are consequential damages, recovery of which Orlando Health waived in its contract with HKS. As explained below, however, because at least some of the damages sought by Orlando Health flowed directly and necessarily from HKS's breach of contract, they are direct damages rather than consequential damages. Thus, the motion for summary judgment must be denied.[3]

## I. Background

On December 30, 2019, Orlando Health and HKS signed, with some modifications, an AIA "Standard Form of Agreement Between Owner and Architect" (Agreement, Doc. 33-2 at 1–41).[4] The Agreement culminated in plans for a 317,185-square-foot hospital tower accommodating 150 beds with

---

[2] As noted earlier, there are no claims by Orlando Health directly against BBM, and if there were, the Court would not have jurisdiction to entertain them. *See* note 1 *supra*. HKS and BBM have filed the motion jointly because "BBM contractually agreed to be bound by HKS to the same extent HKS was contractually bound to [Orlando Health]." (Doc. 50 at 4). Thus, in the joint motion, HKS seeks summary judgment against Orlando Health and BBM in effect seeks summary judgment against HKS because if HKS prevails against Orlando Health, "HKS'[s] derivative claims in the Third-Party Complaint [against BBM] also would be extinguished." (Doc. 50 at 20).

[3] The Court previously ruled on other aspects of the summary judgment motion, concluding that the affirmative defense of waiver had not been forfeited and that "[t]o the extent that what [Orlando Health] seeks are consequential damages, [Orlando Health] has waived them." (Order, Doc. 112, at 3). That Order in effect granted the alternative request for partial summary judgment "as to all consequential damages sought by [Orlando Health] in this action." (*See* Doc. 50 at 20). This Order addresses the remaining issue raised in the motion—whether all of the repair and remediation costs sought by Orlando Health constitute consequential damages.

[4] AIA stands for The American Institute of Architects, and the Agreement between Orlando Health and HKS was AIA Document B101—2017 (as modified by the parties). (*See* Doc. 33-2 at 2).

3

supporting departments—including imaging, infusion, pharmacy, and lab—as well as surface parking, a kitchen, and an energy plant. (Doc. 33-2 at 2). As architect of record, HKS was obligated to sign and seal the final set of architectural and construction plans. (*See* Walsh Decl., Doc. 60-1, ¶ 5). And HKS and Orlando Health "waive[d] consequential damages for claims, disputes, or other matters in question, arising out of or relating to th[e] Agreement." (Agreement § 8.1.3).

HKS in turn engaged BBM to provide the structural engineering services for the project. BBM's broad responsibilities pursuant to its subcontract with HKS included "design responsibilities in the (a) schematic design, (b) design development, (c) construction documents, and (d) construction administration phases of the" project. (Third-Party Compl., Doc. 13, at 3). In this role, "BBM signed and sealed the structural drawings contained within the overall set of drawings submitted by HKS for permitting." (Walsh Decl. ¶ 6). BBM's contractual obligations were only to HKS; Orlando Health had no contractual relationship with BBM. Like the Agreement between HKS and Orlando Health, the contract between HKS and BBM also included a waiver of consequential damages. (*See* Doc. 40 at 6). And "BBM contractually agreed to be bound to HKS to the same extent HKS was contractually bound to" Orlando Health." (Doc. 50 at 4).

Soon after construction began, the construction manager for the project

4

discovered multiple structural failures due to design errors and omissions in the structural engineering plans. (*Id.* ¶ 7). Immediate action was required to correct those failures, including some demolition and rebuilding. That action was taken, at significant cost.

The first failure appeared on the second floor of the hospital, where the slab was cracking at each column line. (*Id.* ¶ 9). The cracking occurred because a full second layer of reinforcing steel—known as "top mat rebar"—was not included in the structural engineering plans. (*Id.*). HKS admitted that the reason the second layer of rebar was not installed was that it was not clearly called for in the drawings. (*Id.* ¶ 18). BBM agreed, (*id.*), and it made revisions and additions to its drawings so that the problem could be corrected, (*id.* ¶ 11). The remediation of this failure required "coring into the concrete, adding rebar through columns, and jacking of the slabs, together with the partial demolition of the elevated slab . . . and completely repouring the concrete for that area." (*Id.* ¶ 12). As damages arising from this defect, Orlando Health seeks $1,499,193 for the slab repair and $79,000 for expert slab-remediation peer-review services. (*Id.* ¶ 22).

The second defect involved a cantilevered overhang on levels 3 and 4 of the North Tower of the hospital. (*Id.* ¶ 24). As admitted by BBM, its design was inadequate to support the cantilevered overhang. (*Id.*). For remediation of this defect, Orlando Health seeks recovery of the $233,153 it spent to correct the

5

cantilevered overhang and column. It also claims $37,000 for peer-review services. (*Id.* ¶ 26).

The third and fourth issues requiring remediation were caused by deficiently designed structural beams. The third issue, which stemmed from these deficient beams, manifested itself in the deflection (bending and deformation) of the slab at Levels 2 and 3 of the hospital's East Tower. (*See id.* ¶¶ 28 & 29). For this, Orlando Health seeks recovery of $895,845 it expended to repair the unevenness of the floor caused by the beam sinkage and $208,750 it paid for peer-review and survey services. (*Id.* ¶ 27).

Remedying what the parties refer to as the fourth issue—the incorrect design of the concrete beams, which caused the floor deflection just discussed—involved expansion of seventeen beams and, in some cases, addition of carbon fiber reinforcement in the beams. This was necessary so that the beams they would "be structurally sound and meet the loading requirements of the building." (*Id.* ¶ 29). And by the time this defect was discovered, "framing, plumbing, electrical[,] and mechanical" work had begun. (*Id.* ¶ 33). Much of that completed work had to be removed to do the necessary remediation. (*Id.*). For this failure, Orlando Health seeks $1,152,641—the amount it paid to remediate the beams. (*Id.* ¶ 39). Additionally, Orlando Health demands $1,183,090—the cost "to demolish and reinstall previous work-in-place materials that were in the way of the remediation of the . . . [b]eams." (*Id.*).

6

And Orlando Health also seeks the $20,000 it paid for peer review services to assess this problem, visit the work site, and write a report. (*Id.*).

In addition to these issue-specific damages, Orlando Health also seeks $32,000 for peer-review services "for the entirety of the building necessitated by" the design defects and $23,000 for site visits by the peer-review provider. (*Id.* ¶ 40). Orlando Health also claims that it incurred "added hard cost" of $160,000 for "extended project management cost." (*Id.* ¶ 41).

Orlando Health contends that by committing these errors, HKS failed to meet the required standard of care, constituting a material breach of the Agreement and "resulting in a structurally unsound, defective, and unsafe construction." (*Id.* ¶ 21). The facts outlined above are not in dispute. But Movants request that the Court grant summary judgment in their favor, contending that as a matter of law all the damages Orlando Health seeks are "consequential" and were thus waived under the Agreement. Thus, the motion for summary judgment requires the Court to determine whether all damages sought by Orlando Health are "consequential" and therefore waived.

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where . . . the material facts are undisputed, the question reduces to a legal one, and summary

7

judgment is appropriate if the [movant is] entitled to judgment as a matter of law." *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1250–51 (11th Cir. 2013).

## III. Discussion

While HKS and Orlando Health contractually waived "consequential damages," they did not define that term in their Agreement. Thus, the parties now look to the Court to fill in this definitional gap for them. Movants argue that all the damages Orlando Health seeks in this lawsuit are consequential damages as a matter of Florida law[5] and that therefore they are entitled to summary judgment. Orlando Health, however, maintains that its claimed damages are not consequential damages but instead direct damages that are not barred by the Agreement's waiver of consequential damages. (*See* Doc. 60 at 11). Because the Court concludes that at least some of Orlando Health's claimed damages are not consequential damages, Movants are not entitled to summary judgment.

Florida courts have defined "consequential damages" as damages that "do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were

---

[5] There is no dispute that the applicable law in this diversity case is the law of Florida. Indeed, Orlando Health and HKS agreed in their contract that Florida law governs. (*See* Agreement § 10.1 ("This Agreement shall be governed by the laws of the State of Florida, without respect to its choice of law provisions." (deletions omitted))).

8

reasonably foreseeable by the breaching party at the time of contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1222–23 (Fla. 1st DCA 2019) (emphasis removed) (quoting *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998)); *see also Consequential Damages*, Black's Law Dictionary (12th ed. 2024) (defining the term as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act"). "The most common form of consequential damages is lost profits." *Hardwick Props.*, 711 So. 2d at 40. Other examples of losses typically regarded as falling into this category are reputational damage, *see, e.g., Schauer v. Morse Operations, Inc.*, 5 So. 3d 2, 7 (Fla. 4th DCA 2009), rental expenses, *Bartram, LLC v. C.B. Contractors, LLC*, No. 1:09-cv-00254-SPM/GRJ, 2011 WL 1299856, at *1 (M.D. Fla. Mar. 31, 2011), and loss of use, *id.*

On the other hand, direct damages—sometimes also referred to as "general damages"[6]—"are commonly defined as those damages which are the direct, natural, logical and necessary consequences of the injury." *Fla. Power Corp. v. Zenith Indus. Co.*, 377 So. 2d 203, 205 (Fla. 2d DCA 1979), *quoted in* Mot. Summ. J., Doc. 50, at 12. They "naturally and necessarily flow or result from the injuries alleged" and "may be described as those damages 'as may fairly

---

[6] As noted during oral argument, "general damages" are sometimes described more broadly as encompassing consequential damages and other damages that are not "special damages." In the interest of clarity, in this Order the Court, like the parties, uses the term "direct damages" instead of "general damages."

and reasonably be considered as arising in the usual course of events from the breach of contract itself.'" *Hardwick Props.*, 711 So. 2d at 39–40 (first quoting *Hutchison v. Tompkins*, 259 So. 2d 129, 132 (Fla. 1972); and then quoting *Fla. E. Coast Ry. v. Beaver St. Fisheries, Inc.*, 537 So. 2d 1065, 1068 (Fla. 1st DCA 1989)); *accord Keystone Airpark*, 266 So. 3d at 1222.

In arguing that all of the repair and remediation costs that Orlando Health seeks in this case are consequential damages, Movants rely primarily on the decision of Florida's First District Court of Appeal in *Keystone Airpark*. Movants describe the *Keystone Airpark* opinion as one that "sen[t] shock waves around the country," suggesting that it drastically broadened the conventional understanding of what constitutes consequential damages. But a close reading of that case undermines Movants' position.

In *Keystone Airpark*, an airpark engaged a contractor to build airplane hangars and taxiways, and it separately contracted an engineering firm "to 'inspect,' 'observe,' and 'monitor'" the construction work. 266 So. 3d at 1221. After construction, the concrete hangar slabs and asphalt taxiways "prematurely deteriorate[d]." *Id.* The airpark then brought suit against both the contractor and the engineering firm, alleging "that the contractor used substandard material for stabilization underneath the structures, which [the engineering firm] failed to detect." *Id.* Against both defendants, the airpark sought to recover "the cost to remove, repair, and replace the hangars, taxiways,

and underlying subgrade." *Id.*

The contract between the engineering firm and the airpark provided that the engineering firm would "have no liability for indirect, special, incidental, punitive, or consequential damages of any kind." *Id.* Citing this contractual provision, the engineering firm moved for summary judgment in the trial court, arguing that the damages sought by the airpark "were not a direct result of [the engineering firm]'s alleged failure to perform under the contract" but instead "resulted from a combination of [the engineering firm]'s alleged failure to perform construction inspection services under the contract and the contractor preparing the subgrade improperly." *Id.* Thus, argued the engineering firm, the repair costs sought by the airpark were consequential damages rather than direct damages. *Id.* The trial court agreed and granted the engineering firm's summary judgment motion. *Id.*

On appeal, the First District Court of Appeal affirmed. In doing so, the court concluded that the repair costs "were not the direct or necessary consequence of [the engineering firm]'s alleged failure to properly inspect, observe, monitor, and report problems with the construction work" because "[t]he contractor could have completed the job correctly without [the engineering firm] performing its duties under the contract." *Id.* at 1223. Accordingly, said the court, "the need for repair did not arise within the scope of the immediate transaction between [the engineering firm] and the [a]irpark" but instead

11

"stemmed from loss incurred by the [a]irpark in its dealings with a third party—the contractor." *Id.* The court thus agreed with the trial court that the repair costs the airpark sought from the engineering firm were "consequential damages" that the airpark could not recover because in its agreement with the engineering firm it had waived the right to recover those damages. *Id.*

In essence, Movants describe *Keystone Airpark* as on all fours with the case at bar and argue that the decision compels a ruling in their favor. But *Keystone Airpark* is both factually and legally distinguishable, and this Court is not persuaded by Movants' position.

First of all, Movants characterize *Keystone Airpark* as involving "the designer's negligence." (Doc. 50 at 10). But it did not. Although an engineering firm was the relevant defendant in that case, the decision did not involve design services but only project management and inspection services by the engineering firm. *See, e.g.*, 266 So. 3d at 1223 (referring to the "alleged failure to properly inspect, observe, monitor, and report problems with the construction work").[7] Indeed, in its analysis the *Keystone Airpark* court lamented the lack of

---

[7] The engineering firm in *Keystone Airpark* had also designed the project, but it is apparent from the appellate court's decision that "design" or "engineering" services were not at issue—only "inspection" and "monitoring" services were. Any doubt on this point is put to rest by the trial court's May 22, 2017 summary judgment order in that case, which states in part: "The parties agree that [the airpark] makes no claim with respect to the engineering services provided by [the engineering firm]; [the airpark]'s claim is founded on [the engineering firm]'s contractual duty to manage the project and to inspect [the contractor]'s work for contract compliance." *Pipeline Contractors, Inc. v. Keystone Airpark Auth.*, Case No. 2010-CA-2457 (Fla. 4th Cir. Ct. May 22, 2017).

12

"case law directly on point involving damages stemming from the failure to *inspect and monitor* construction work" and looked to cases arising in other contexts for guidance in resolving the question before it.[8] *Id.* (emphasis added). Thus, *Keystone Airpark* did not involve "designer's negligence" as asserted by Movants.

Movants also attempt to draw a parallel between this case and *Keystone Airpark* with regard to the non-breaching party's "dealings with the contractor." As noted earlier, the *Keystone Airpark* court concluded that "the need for repair stemmed from loss incurred by the [a]irpark in its dealings with a third party—the contractor" rather than "aris[ing] within the scope of the immediate transaction between" the airpark and the engineering firm." 266 So. 3d at 1223. From this, Movants extrapolate that the costs Orlando Health incurred to pay for repairs stemmed from its dealings with its contractor and consultants and "did not arise within the scope of the immediate transaction between" Orlando Health and HKS. (Doc. 50 at 12). But these factual scenarios are not analogous.

---

[8] The fact that *Keystone Airpark* involved inspecting and monitoring—and not designing—is also clear from the question the First District Court of Appeal certified to the Supreme Court of Florida: "Where a contract expressly requires a party to inspect, monitor, and observe construction work and to determine the suitability of materials used in the construction, but the party fails to do so and inferior materials are used, are the costs to repair the damage caused by the use of the improper materials general, special, or consequential damages?" 266 So. 3d at 1224. Incidentally, the Supreme Court of Florida denied the petition for review, declining to exercise its jurisdiction to review the decision of the First District Court of Appeal. *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, Case No. SC19-314, 2019 WL 1371949 (Fla. Mar. 27, 2019).

13

In *Keystone Airpark*, the contractor caused the damages that needed to be repaired. That is not the situation here, where the damages undisputedly were caused by deficiencies in the structural engineering plans for which HKS was responsible—not by any actions of the contractor or anyone other than HKS or its subcontractors. Movants' attempt to analogize to the contractor's role in *Keystone Airpark* is unavailing.

Movants also argue that the "immediate buyer-seller transaction" here is the agreement for Orlando Health to pay HKS a fee for professional services and that thus the only direct damages suffered by Orlando Health "would be the costs incurred by [Orlando Health] if HKS failed to provide those services and [Orlando Health] incurred losses obtaining those services elsewhere." (Doc. 50 at 11). But nothing in *Keystone Airpark* supports this proposition. The *Keystone Airpark* court concluded that "the need for repair did not arise within the scope of the immediate transaction between" the engineering firm and the airpark because "the contractor could have completed the job correctly" regardless of whether the engineering firm performed its inspection and monitoring services as it should have. 266 So. 3d at 1223. In other words, the need for repair was outside the immediate transaction between the engineering firm and the airpark because it was directly caused by someone else—the contractor—instead of by the engineering firm.

In the case at bar, however, the need for extensive repairs to the hospital

14

did arise "within the scope of the immediate transaction" between Orlando Health and HKS. HKS was not contracted to monitor the drawings or other activities of someone else who was the direct cause of the damage. Instead, HKS was obligated to provide structural engineering plans for the project, and there is no dispute that the need for repairs was caused solely by deficiencies in those plans. *Keystone Airpark* provides no basis for limiting the damages that Orlando Health suffered to the cost of procuring correct structural engineering plans, as argued by Movants.

Beyond *Keystone Airpark*, both sides rely on *Lochrane Engineering, Inc. v. Willingham Realgrowth Investment Fund, Ltd.*, 552 So. 2d 228 (Fla. 5th DCA 1989), but that case is not helpful to resolution of the issue now before the Court. Orlando Health touts *Lochrane* for its statement in dicta that an engineer "is liable when damages are legally caused by his professional negligence as when an insufficiently designed structure fails and the failure causes damages." 552 So. 2d at 233. And for their part, Movants rely on *Lochrane* for dicta in which the court referred to "other consequential damages"; Movants suggest that the court was stating that repair costs were also consequential damages. But the facts in *Lochrane* are dissimilar to the facts here; that case did not involve a waiver of consequential damages, and the court was not categorizing different types of damages.

Movants also rely on various out-of-state federal and state cases, most of

15

which discuss Virginia statutes of limitations. None is availing. The out-of-state cases cited are factually dissimilar and are neither controlling nor persuasive. Nor does the Court find instructive the cases cited by Movants that involve claims under the Florida Deceptive and Unfair Trade Practices Act.

At oral argument, Orlando Health averred that Movants' contention that these repair costs are "consequential" rather than direct is a novel one in the industry. That may well be true; the Court's research has uncovered no case where such an argument was made by an architect or engineer who was sued based on repair costs due to defective plans. However, similarly situated defendants in some cases have conceded that such costs are direct damages that fall outside a consequential-damages waiver. *See, e.g., Chinese Hosp. Ass'n v. Jacobs Eng'g Grp., Inc.*, Case No. 18-cv-05403-JSC, 2019 WL 6050758, at *5 (N.D. Cal. Nov. 15, 2019) (noting that the architecture firm that designed a hospital "concede[d] that any costs [the p]laintiff may have paid to the general contractor to demolish and replace construction performed by [the firm]'s allegedly defective design constitute direct damages"); *Atl. City Assocs., LLC v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 178–80 (3d Cir. 2011) (case in which the defendant architect successfully argued on appeal that "[l]ost rental income," "[a]dditional payments to contractors due to delay," and "[a]dditional administrative costs" were barred by contract's waiver of consequential damages but did not challenge the trial court's conclusion that

"[a]dditional construction costs to fix errors" were not so barred).

Absent Florida case law directly on point, the task of this federal court is to predict how the Supreme Court of Florida would resolve the issue presented here. *See, e.g., Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Based on the definitions of the relevant terms and the facts of this case, the Court finds that Orlando Health's costs of remediation and repair are not consequential damages that were waived in the Agreement. HKS was contractually obligated to provide plans, including structural engineering plans, for the construction of a hospital in a large project coordinated among many sophisticated parties. The costs of remediation and repair did not "result indirectly from" HKS's plans,[9] nor did they arise from "dealings with third parties" in either the more "traditional" sense (such as lost profits or loss of reputation) or the causative way described by the *Keystone Airpark* court. Instead, the costs to repair and remediate are the "direct, natural, logical[,] and necessary consequences of" HKS's deficient plans.[10] Thus, recovery of these damages is not barred by the consequential-damages waiver in the Agreement.[11]

---

[9] *Consequential Damages*, Black's Law Dictionary (12th ed. 2024).
[10] *Fla. Power Corp.*, 377 So. 2d at 205.
[11] The issue raised in the motion for summary judgment was the categorization of Orlando Health's claimed damages as direct or consequential. The motion papers do not address any issues that might exist regarding the propriety or amounts of the discrete items of damages claimed by Orlando Health. Any such issues are not resolved by this Order.

## IV. Conclusion

Accordingly, it is **ORDERED** that the Motion for Summary Judgment (Doc. 50) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on July 11, 2025.

                                                             JOHN ANTOON II
                                                             United States District Judge

Copies furnished to:
Counsel of Record